The STATE of Ohio, Appellee,

v.

GUNTHER, Appellant.■

[Cite as *State v. Gunther* (1998), 125 Ohio App.3d 226.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 96–T–5605.

Decided Jan. 2, 1998.

228

*Dennis Watkins,* Trumbull County Prosecuting Attorney, and *Luwayne Annos,* Assistant Prosecuting Attorney, for appellee.

*Wesley A. Dumas, Sr.,* for appellant.

WILLIAM M. O'NEILL, Judge.

Appellant, William K. Gunther, appeals from the judgment and imposition of sentence rendered by the Trumbull County Court of Common Pleas after a jury found him guilty of felonious assault with a firearm specification. For the reasons that follow, we affirm the judgment of the trial court in part, and reverse in part and remand with instructions that the indictment brought down against appellant in violation of the statutory procedures as set forth in R.C. Chapter 2313 be dismissed.

On August 8, 1995, appellant was indicted by the Trumbull County Grand Jury on one count of felonious assault in violation of R.C. 2903.11(A)(2) with a firearm specification pursuant to R.C. 2941.141. The indictment related to an assault that occurred against Alexandria "Var" Bowers on April 1, 1995, in Warren, Ohio. To the above charge, appellant entered a plea of not guilty, and the matter proceeded to a jury trial on July 22, 1996.

On July 19, 1996, three days prior to the commencement of trial, appellant sought to quash the indictment when he discovered irregularities in the grand jury selection process. Specifically, appellant established that the public officials entrusted to sign the certification of the venire failed to sign the certification as required by R.C. 2313.21. On the date of trial, July 22, 1996, the prosecution moved to dismiss appellant's motion as untimely under Crim.R. 12(C). After the start of trial, on July 23, 1996, the trial court granted the state's motion to dismiss, and appellant's trial continued.

At trial, Bowers testified that she first became acquainted with appellant when she was thirteen years old and her family lived on Roosevelt Street in Warren, Ohio. Appellant, aged seventeen at the time, had been to Bowers's home on a couple of occasions to visit her older brother. Bowers's family moved from Roosevelt Street when she was fourteen years old and, prior to March 31, 1995, she had no contact with appellant except, perhaps, in passing.

On March 31, 1995, Bowers saw appellant as she was entering her car, a late model grey Cadillac, after returning from the license bureau on Elm Road. Appellant, who was entering a liquor store located next to the license bureau, recognized Bowers and they exchanged greetings.

Later that same day, Bowers and a friend, Tammy Anderson, went out for the evening. In the early morning hours of April 1, 1995, sometime after 2:00 a.m., Bowers dropped her friend off at home. While outside Anderson's house, in the same late model Cadillac she was driving earlier in the day, Bowers again encountered appellant. Apparently recognizing Bowers's car, appellant pulled up beside her, and the two began to talk about their chance meeting earlier in the day. Bowers ended her conversation with appellant and began to drive home. Anderson confirmed that before she saw Bowers leave her driveway, she saw an individual in a second car pull up next to Bowers's vehicle.

When Bowers returned home, appellant, who apparently followed her home in his car, pulled into her driveway and asked if he could park his car there in order to visit his uncle who, he said, lived behind her. Shortly thereafter, as Bowers was preparing to go to bed, appellant knocked on her door and asked whether he could use the telephone. After appellant finished using the phone, he began to walk through Bowers's home.

Bowers eventually became uneasy with appellant's presence in her home and she asked him to leave. As appellant walked to the front door, he turned around and pointed a gun at Bowers's head. Appellant told her that he was not leaving "without getting some," and he told her to "[t]ake that shit off now" and get on her knees. Bowers, pleading with appellant, unbuttoned her skirt, which then fell to the ground. Before she went to her knees, she managed to jump toward appellant and push the gun away from her.

A struggle ensued and appellant fired a round at Bowers, just missing her leg. Bowers heard appellant repeatedly try to fire the gun again, "clicking" the trigger, but the gun would not fire. Bowers tried to scratch and bite appellant as their struggle spilled into other rooms of her home. Eventually, she managed to escape through the front door. In cold temperatures, wearing only a blouse and underclothes, Bowers jumped over a fence and hid from her attacker for twenty or thirty minutes while appellant called for her and circled in his car around the neighborhood. When she felt safe, she ran a few blocks to her brother's house. Bowers's brother, Andre Bowers, testified that his sister was crying and frantic, wearing only a blouse and underclothes, and that she identified appellant as her attacker. She was immediately taken to the hospital for treatment.

While at the hospital, Bowers gave a statement to Sergeant Catherine Giovannone of the Warren City Police Department, again identifying appellant as her attacker. In the early morning of April 1, 1995, at approximately 6:30 a.m., Sgt.

Giovannone escorted Bowers, who was planning to stay with her mother, to her home so that she could get a few items of clothing. At that time, Sgt. Giovannone saw the damaged condition of the home caused by the alleged struggle with appellant, including a bullet hole in the wall. Sgt. Giovannone also found a 9-mm shell casing on the floor.

As part of their investigation, Warren Police obtained blood samples from appellant to compare with blood stains taken from the victim's shirt and stains from a door frame within the victim's home. These samples were sent to the Federal Bureau of Investigation ("FBI") in Washington, D.C., for DNA analysis. The result of the DNA analysis revealed that the blood on Bowers's shirt could have been the same as the sample submitted from appellant. A forensic scientist from the DNA Unit of the FBI laboratory in Washington, D.C. labeled appellant as a "potential contributor" of the blood found on Bowers's shirt, and calculated that the likelihood of selecting another individual at random as a contributor was one in one hundred thousand in the black population, one in twenty-seven million in the Caucasian population, one in twenty-six million in the southeastern Hispanic population, and one in seventy-five million in the southwestern Hispanic population.

Appellant, who took the stand in his own defense, acknowledged that he had met Bowers several years ago when they were children and that he ran into her while going to the liquor store the afternoon of March 31, 1995. However, appellant denied that he was the person responsible for the attack on Bowers and testified that he was at home in bed at the time of the alleged incident.

Appellant testified that on the day prior to the alleged incident, he took a vacation day from his job at Packard Electric, since his second daughter, born two days earlier, was coming home from the hospital that day. Later that same evening, two of his co-workers took him to the Palladium in Youngstown, Ohio, to celebrate. Appellant admitted that he had quite a bit to drink that evening. On the early morning of April 1, 1995, at approximately 1:00 a.m., appellant and his two co-workers left the Palladium and traveled to the Top Hatter's Club in downtown Warren, Ohio. Appellant stated that due to his level of intoxication, he waited outside next to the car as his co-workers entered the club. Although not remembering how he returned home that evening, appellant remembered almost falling on his wife as he rolled into bed at 2:40 a.m.

The next morning, appellant testified that he was awakened by his wife's claiming that somebody was shooting at the house. Appellant confirmed that shots were fired at his home and reported the incident to the police. That same day, he moved his family out of the home and made plans to move with his family out of state.

Following his drunken episode with his co-workers the night before, appellant testified that he and his wife discussed his substance abuse problem. On April 7, 1995, appellant checked himself into Glenbeigh Hospital for a twenty-eight-day alcoholism program. During the time of his hospitalization, appellant never called his supervisor at Packard Electric to explain the reasons for his absences and was deemed to have voluntarily quit. Appellant claimed at trial that he did not return to work because he was planning to meet his family out of state. However, appellant admitted that he did file a grievance with the labor union to get his job back with Packard Electric.

In rebuttal, the prosecution presented evidence that the Top Hatter's Club, the club appellant testified that he went to in the early morning hours of April 1, 1995, had been shut down several months before the alleged attack on Bowers. Appellant's counsel argued that appellant, due to his level of intoxication that evening, did not remember the bar's name. In closing argument, the prosecution challenged appellant's alibi and questioned why appellant was unable to present any witnesses in support of his alibi. Specific to appellant's assigned errors, the prosecution asked, over a defense objection, why appellant's wife did not testify that appellant stumbled over her as he got into bed at 2:40 a.m. the night Bowers was attacked.

Following the state's argument, the defense moved for a mistrial based on the prosecutor's commenting on appellant's failure to call his wife, a witness he had provided in discovery as a potential witness, to substantiate his alibi. Additionally, appellant argued that the evidence presented at trial supported a jury instruction on simple assault. The trial court denied appellant's motions.

On July 26, 1996, the jury found appellant guilty of felonious assault with a firearm specification. Appellant was sentenced to an indefinite term of incarceration of eight to fifteen years plus an additional three years of actual incarceration for the firearm specification to be served prior to and consecutive with the underlying sentence.

Appellant filed a motion for a new trial, and, following the trial court's denial of that motion without comment, filed a timely notice of appeal. Appellant now asserts the following four assignments of error:

"1. The court committed prejudicial error by allowing the prosecutor to vigorously argue that the wife of the [appellant] did not testify as an alibi witness when she was named in the discovery responses.

"2. The lower court erred as a matter of law, denying [appellant's] motion to quash the indictment, thereby preventing him a fair trial as required by the United States Constitution.

"3. By refusing to charge the jury on the lesser included offense of assault, the court denied [appellant] a fair trial.

"4. The trial court erred in failing to consider the sentencing criteria set forth in R.C. 2929.12."

Because appellant's second assignment of error is dispositive of this appeal, this argument will be discussed first.

In the second assignment of error, appellant asserts that the trial court erred in failing to grant his motion to quash the indictment.[1] The argument appellant presented before the trial court, three days prior to trial, raised serious questions as to the procedures utilized in selecting the grand jury that brought down the indictment against him. Most notably, appellant proffered evidence that the elected officials charged with overseeing the jury selection process, including a judge of the Trumbull County Court of Common Pleas or a designated representative, failed to certify that the procedures utilized to ensure a fair jury selection process had been complied with. R.C. 2313.23 provides:

"All drawings of jurors shall be public on a day designated by the commissioners of jurors, not less than fourteen or more than twenty-eight days before the day appointed for holding a term or part of a term of a court of record, at which issues of fact are triable by jury. A commissioner or his designated representative, the sheriff of the county, in person, or by his deputy or other designated representative, a judge of the court of common pleas or his designated representative, and the clerk of the court of common pleas, or his deputy or other designated representative, shall attend at the office of the commissioners to witness and assist in the drawing of jurors for the term."

R.C. 2313.20 reiterates the need to have all of the above elected officials at the drawing of jurors and provides for the postponement of the drawing and a one-hundred-dollar fine for any official who fails to attend. Moreover, R.C. 2313.21 requires the above elected officials or their designated representative to certify that the procedures set forth in R.C. 2313.01 to R.C. 2313.46, consisting of the

---

1. While no objection has been raised as to the form of appellant's motion, we note that the Ohio Rules of Criminal Procedure no longer recognize motions to quash. Crim.R. 12(A) provides:

"(A) Pleadings and Motions. Pleadings in criminal proceedings shall be the complaint, and the indictment or information, and the pleas of not guilty, not guilty by reason of insanity, guilty, and no contest. All other pleas, demurrers, and *motions to quash, are abolished. Defenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss* or to grant appropriate relief, as provided in these rules." (Emphasis added.)

As the form of appellant's motion was not the basis for the trial court's decision, and the prosecution has treated appellant's argument as a motion to dismiss, we will consider appellant's motion as if it had been properly raised as a motion to dismiss.

rules governing the entire jury selection process, have been met. For reasons that are not apparent in the record before us, the certification requirement of R.C. 2313.21 was not completed by *any* of the above elected officials of Trumbull County or their designated representatives.

Appellant, in his motion of July 19, 1996, requested an evidentiary hearing to inquire into the procedures used to select the grand jury. Such a hearing would have provided appellant the opportunity to demonstrate prejudice, or lack thereof, from the procedures employed in his case. Unfortunately, appellant was never given the opportunity to prove what, if any, prejudice occurred in his case. On the date of trial, July 22, 1996, appellee filed a motion to dismiss appellant's motion for failing to file the motion within the time constraint outlined in Crim.R. 12(C), which states that "[a]ll pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier." Although the trial court has discretion, in the "interest of justice," to extend the time for filing pretrial motions, the court granted appellee's motion to dismiss on July 23, 1996.

On appeal to this court, the parties argue as to the various procedures that were not followed, and may not have been followed, in the selection of the grand jury that brought down the indictment in appellant's case. The state concedes that *none* of the elected officials, or their designated representatives, certified that the procedures utilized to ensure a fair jury selection process had been complied with. Despite the wholesale violation of R.C. 2313.21 in this case and the potential violation of the entire jury selection process that may have occurred, appellee argues that a reversal of appellant's conviction is not warranted because he has not proven that the grand jurors who indicted him were not qualified to serve on the panel.

Appellee notes, correctly, that the controlling case involving R.C. Chapter 2313 is *State v. Puente* (1982), 69 Ohio St.2d 136, 23 O.O.3d 178, 431 N.E.2d 987. In *Puente*, a hearing was held in the Ashtabula County Court of Common Pleas on a challenge to a jury array. The evidence presented at the hearing established that a jury commissioner was manipulating the jury selection process by improperly consulting certain individuals to discuss which citizens of the community would make competent jurors. Those deemed to have the necessary qualifications were included in the jury array. Additionally, the jury commissioner further skewed the process by automatically exempting doctors, dentists, lawyers, and students studying outside the county. Finally, the commissioner kept no records of his proceedings. *Id.* at 137, 23 O.O.3d at 178–179, 431 N.E.2d at 988–989.

In a four-to-three decision, a majority of the Supreme Court of Ohio held that violations of the provisions set forth in R.C. 2313.01 *et seq.* will not necessarily

lead to the reversal of a conviction unless an accused can demonstrate prejudice in the procedures that were used or that the jurors selected under an improper process were not "qualified jurors." *Id.* at 138, 23 O.O.3d at 179, 431 N.E.2d at 989; *State v. Fulton* (1991), 57 Ohio St.3d 120, 124–125, 566 N.E.2d 1195, 1200–1201. While upholding the conviction in *Puente,* the Supreme Court of Ohio expressed its concern with the procedures used by the jury commissioner in that case and issued the following warning:

"Parenthetically, yet with great emphasis, we wish to state that just because failure to follow R.C. 2313.01 *et seq.* will not, of itself, result in a reversal, does not mean that these practices should be countenanced by the courts of common pleas. Jury commissioners are appointed by the judges of the courts of common pleas in each county and hold office at the pleasure of the judges. R.C. 2313.01. This being so, the judges should give their employees guidance and direction to insure that the laws relating to the selection of jurors are scrupulously followed. Judges should call attention to the fact that R.C. Chapter 2313 contemplates a random selection of jurors from all sections of each county. See R.C. 2313.08. It is only when these random procedures are followed that the criminal justice system will be insulated from challenges such as the present one. Cf. *State v. Ballard* (1981), 66 Ohio St.2d 473 [20 O.O.3d 397, 423 N.E.2d 115], and *State v. Sturm* (1981), 66 Ohio St.2d 483 [20 O.O.3d 403, 422 N.E.2d 853].

"Additionally, the failure to follow the state statutes may result in unintentional violations of the fair cross-section requirement. See *Smith v. Yeager* (C.A.3, 1972), 465 F.2d 272, certiorari denied 409 U.S. 1076 [93 S.Ct. 685, 34 L.Ed.2d 665]." *Puente,* 69 Ohio St.2d at 139, 23 O.O.3d at 180, 431 N.E.2d at 989–990.

In dissent, then Chief Justice Celebrezze, citing United States Supreme Court precedent, argued that an accused should not be required to demonstrate prejudice in order to prevail in a jury selection challenge. Additionally, the dissent questioned whether an accused could ever meet the standard as set forth in the majority opinion.

Today, fifteen years after the Supreme Court of Ohio's decision in *Puente,* this court is once again faced with very serious questions about the jury selection procedures utilized in a county that is part of this appellate district. The expense to the persons charged with the responsibility to oversee that the jury selection process is complied with, as set forth in R.C. 2313.01 *et seq.,* is negligible. The costs for the failure to comply with these statutory requirements, as the *Puente* court noted, may be great.

■ The state argues that the present case is nearly identical to *Puente.* While appellee concedes that violations of R.C. Chapter 2313 occurred in this case, the state argues that appellant has not demonstrated that the jurors who

indicted him were not "qualified jurors." The state's argument ignores the procedural history of this case.

As previously noted, appellant, three days prior to trial, filed a motion seeking an evidentiary hearing because the governmental officials charged to oversee the jury selection process failed, at a minimum, to comply with the certification requirement of R.C. 2313.21. Ironically, the state, which now argues that we should overlook the rule violations that have occurred in this case, filed a motion to dismiss appellant's request for an evidentiary hearing because appellant, at the time of filing his motion, failed to comply with the rules (Crim.R.12[C]). Although the trial court could have excused appellant's failure to file his motion timely, in the interest of justice, the trial court granted the state's motion to dismiss. Thus, the trial court did not deny appellant's motion to quash the indictment, as argued by the parties in their briefs to this court, but *dismissed* appellant's motion as untimely. Consequently, unlike *Puente*, appellant was not granted an evidentiary hearing from which to establish that he was prejudiced by the violations of rules enacted to ensure a fair jury selection process.

██ While the parties did not directly raise this issue in their briefs to this court, it became evident at oral argument that the true controversy between the parties is whether the trial court erred in dismissing appellant's untimely pretrial motion and allowing appellant, in the interest of justice, an opportunity to present evidence as to the statutory violations that occurred in his case and the prejudice, if any, resulting therefrom. An appellate court may rule upon errors neither assigned nor briefed. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 203, 24 OBR 426, 430, 494 N.E.2d 1101, 1105.

██ There is no doubt that the decision to accept an untimely pretrial motion is within the discretion of the trial court. However, under the circumstances of this case, it was unreasonable for the trial court to deny appellant the opportunity, at the very least, to demonstrate prejudice from an error in the jury selection process that the state admits happened. Factored into our decision, we are distressed that a judge of the Trumbull County Court of Common Pleas agreed to rule on a motion alleging that a judge of the Trumbull County Court of Common Pleas may have played a part in the failure to properly certify that the jury selection process was properly conducted in appellant's case. This does not mean that we blame the trial court for the apparent violations of R.C. Chapter 2313 that occurred in this case. However, in *State v. Bayer* (1995), 102 Ohio App.3d 172, 174, 656 N.E.2d 1314, 1315, this court noted the importance of the judiciary to remain detached and neutral in any proceeding before it and to satisfy the *appearance* of justice. The statutory procedures enacted to ensure a fair jury selection process, based on the facts of this case, appear to implicate on

the trial court's ability to remain a neutral and detached participant in this proceeding.

In *Puente,* the Supreme Court of Ohio, noting that the judges of the courts of common pleas appointed the jury commissioner who was responsible for a number of the statutory violations that occurred in that case, suggested that the various judges of the courts of common pleas "give their employees guidance and direction to insure that the laws relating to the selection of jurors are scrupulously followed." However, the Supreme Court of Ohio has offered no guidance for the situation that now presents itself when the judges of the courts of common pleas *might* be responsible for failing to ensure that the laws relating to the selection of jurors were scrupulously followed.

█ It is not our intention to criticize those persons responsible for the debacle that is now before us. However, the facts surrounding appellant's case, and the questions it has raised, were not considered when the Supreme Court of Ohio decided *Puente.* Quite frankly, this court, while trying to adhere to the holding in *Puente,* has no answers to the questions raised in appellant's case. On another set of facts, where the trial court was not implicated, at least in part, in the failure to oversee the jury selection process, we would be inclined to remand the matter to the court for a hearing on appellant's motion. Under such circumstances, appellant would be given the opportunity to show how he was prejudiced by the irregularities that occurred in the jury selection process. However, under the factual scenario before us, evidencing a wholesale violation in the process used to oversee the entire jury selection process, we are compelled to force the state to start anew and instruct the trial court to dismiss the indictment brought down against appellant.

In making our decision that appellant's indictment should be dismissed, we note, as the analysis of appellant's remaining assignments of error will reveal, that the evidence of appellant's guilt in this matter is overwhelming. However, due to the nature of the argument raised in appellant's second assignment of error, we are prevented from applying harmless error review.

In *State v. Esparza* (1996), 74 Ohio St.3d 660, 661, 660 N.E.2d 1194, 1195–1196, the Supreme Court of Ohio noted that the United States Supreme Court has distinguished between two different types of constitutional error, "trial error" and "structural error" defined as follows:

"Trial error 'occur[s] during the presentation of the case to the jury, and * * * may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.' [*Arizona v. Fulminante* (1991)] 499 U.S. [279] at 307–308, 111 S.Ct. [1246] at 1264, 113 L.Ed.2d [302] at 330 * * *.

"Structural error affects 'the entire conduct of the trial from beginning to end' as well as 'the framework within which the trial proceeds.' Such errors 'defy analysis by "harmless-error" standards.' *Id.* at 309–310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331 * * *." *Esparza* at 661, 660 N.E.2d at 1196.

The United States Supreme Court has held that error in the formation of a grand jury "undermines the structural integrity of the Criminal Tribunal itself, and is not amenable to harmless-error review." *Vasquez v. Hillery* (1986), 474 U.S. 254, 263–264, 106 S.Ct. 617, 623, 88 L.Ed.2d 598, 609. Moreover, we can find no solace in the fact that a jury, at trial, found appellant guilty beyond a reasonable doubt. As the United States Supreme court explained:

"The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts * * *. Thus even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or the very existence of the proceedings to come." *Id.* at 263, 106 S.Ct. at 623, 88 L.Ed.2d at 608–609.

Reluctantly, we agree with appellant's second assignment of error. We recognize that some might criticize our decision for reversing an otherwise valid conviction on a "technicality." However, a proper indictment procedure and a retrial are the costs that our society must bear to ensure the integrity of the jury selection process. This case transcends the question of appellant's guilt or innocence. In a free society, the integrity of our judicial system is of great importance to all citizens. Both the accused and society need to know that the system is fair. Otherwise, a conviction or an acquittal would have no meaning. Appellant's second assignment of error is with merit.

In light of our decision with respect to appellant's second assignment of error, appellant's remaining assignments of error, relating to errors at trial, could be treated as being moot and not needing to be addressed pursuant to App.R. 12(A)(1)(c). Nevertheless, due to the nature of the issues presented for review and the possibility of their repetition in a latter proceeding, appellant's remaining assignments of error will be briefly discussed.

In the first assignment of error, appellant argues that the prosecutor improperly commented on appellant's failure to call his wife, a person he provided in discovery as a potential witness, to substantiate his alibi. We disagree.

At trial, appellant's defense centered upon his testimony that he had already returned home, and fell into bed next to his wife, at the time of the victim's allegations. During closing argument, the prosecution questioned why appellant's wife did not testify to substantiate her husband's alibi. Appellant argues that the prosecutor's comments violated Crim.R. 16(C)(3) and denied him a fair trial.

Crim.R. 16(C)(3) provides that "[t]he fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial." The Supreme Court of Ohio has interpreted this to mean that once a person's name is placed on a witness list, no comment may be made as to that person's absence at trial. *State v. Hannah* (1978), 54 Ohio St.2d 84, 90, 8 O.O.3d 84, 87–88, 374 N.E.2d 1359, 1363–1364.

The dissent in *Hannah* criticized the majority opinion as follows:

"Appellant's fifth proposition of law also should be overruled. Crim.R. 16(C)(3) is designed to prevent any comment on the failure of a party to call a witness listed in response to discovery by noting that the party had listed the witness but failed to produce that witness. Crim.R. 16(C)(3) was not designed to preclude valid comment upon the absence of a witness that would apply irrespective of the name being included in response to discovery." *Id.* at 93, 8 O.O.3d at 89, 374 N.E.2d at 1365.

Some appellate courts have adopted the interpretation of Crim.R. 16(C)(3) as set forth in the *Hannah* dissent. See, *e.g.*, *Jackson v. Howell* (1993), 86 Ohio App.3d 497, 500, 621 N.E.2d 573, 574–575. We also agree that the dissent in *Hannah* sets forth the better interpretation of Crim.R. 16(C)(3) and find no error in the prosecution's argument, as no mention was made of the fact that appellant's wife was named on a witness list. Additionally, as the evidence against appellant was overwhelming, any error caused by the prosecutor's comments was, at worst, harmless. The victim never wavered in her identification of appellant as her attacker, and DNA evidence also linked appellant to the crime. Furthermore, appellant's alibi, which consisted, in part, of appellant's claim that he was out with some friends at a bar that had been shut down months before the attack, was simply not believable. Appellant's first assignment of error is without merit.

In the third assignment of error, appellant argues that the trial court erred in refusing to charge the jury on the lesser included offense of assault. We disagree.

Simple assault, as described in R.C. 2903.13(A), is a lesser included offense of felonious assault as set forth in R.C. 2903.11(A)(2) because the elements of the two crimes are the same except that felonious assault has the

additional element that an accused used "a deadly weapon or dangerous ordnance." However, although simple assault is a lesser included offense of felonious assault, an instruction is required only if the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; *State v. Calabrese* (Feb. 9, 1996), Lake App. No. 95–L–054, unreported, at 9, 1996 WL 200578.

In the present case, appellant points to minor "inconsistencies" in the victim's testimony as to whether she actually saw the gun go off and whether the assailant struck her in the face with the gun or pointed the gun directly at her head. Appellant argues that these inconsistencies form the basis for a jury instruction on simple assault. However, the evidence was uncontroverted that the victim saw appellant with a gun and that he fired a round just missing her leg. Other than the appellant's denial that he was even there, there was no evidence presented to suggest that the gun was anywhere but in his hand at all times relevant to this attack. Under these facts, it cannot seriously be contended that appellant committed an assault without "a deadly weapon or dangerous ordnance." Appellant's third assignment of error is without merit.

In the fourth assignment of error, appellant argues that the trial court failed to consider the sentencing guidelines as set forth in R.C. 2929.12. We disagree.

A trial court is granted broad discretion in sentencing. In *State v. Cyrus* (1992), 63 Ohio St.3d 164, 166, 586 N.E.2d 94, 95–96, the Supreme Court of Ohio stated:

"This court has held that: 'A silent record raises the presumption that a trial court considered the factors contained in R.C. 2929.12.' *State v. Adams* (1988), 37 Ohio St.3d 295, 525 N.E.2d 1361, paragraph three of the syllabus; accord *State v. O'Dell* (1989), 45 Ohio St.3d 140, 147, 543 N.E.2d 1220, 1227. Nothing in the statute or the decisions of this court imposes any duty on the trial court to set forth its reasoning. The burden is on the defendant to come forward with evidence to rebut the presumption that the trial court considered the sentencing criteria."

Additionally, this court has stated:

" '[I]t is well established that where the sentence imposed is within the statutory limits, the appellate court cannot hold that the trial court abused its discretion by imposing too harsh a sentence. *State v. Coyle* (1984), 14 Ohio App.3d 185 [14 OBR 203, 470 N.E.2d 457].' *State v. Sauers* (Dec. 11, 1992), Portage App. No. 92–P–0015, unreported, 1992 WL 366966." *State v. Brown* (1993), 88 Ohio App.3d 509, 513, 624 N.E.2d 329, 331.

In the present case, appellant was given the maximum sentence within the sentencing guidelines. There is nothing that supports appellant's contention that the trial court did not consider the proper sentencing criteria or otherwise abused its discretion in this matter. Appellant's fourth assignment of error is without merit.

Based on the foregoing, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded with instructions that the indictment brought down against appellant in violation of the statutory procedures as set forth in R.C. Chapter 2313 be dismissed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

FORD, P.J., concurs with concurring opinion.

CHRISTLEY, J., dissents with dissenting opinion.

FORD, Presiding Judge, concurring.

I concur with the majority's conclusions regarding appellant's second, third, fourth, and fifth assignments of error. While I also agree with the majority's ultimate determination that appellant's first assignment of error is without merit, I write separately to address what I believe to be a misapplication of the pertinent case law by the majority in reaching its conclusion regarding appellant's first assignment of error.

With respect to the propriety of the prosecutor's comment on the absence of appellant's alibi witness, the majority concludes that there was "no error in the prosecution's argument, as no mention was made of the fact that appellant's wife was named on a witness list." The majority's position on the first assignment of error is at variance with this court's prior statement in *State v. Davie* (Dec. 27, 1995), Trumbull App. No. 92–T–4693, unreported, 1995 WL 870019, in which we stated:

"In *State v. Hannah* (1978), 54 Ohio St.2d 84 [8 O.O.3d 84, 374 N.E.2d 1359], a majority of the Supreme Court of Ohio held that any comment upon the absence of testimony from a witness named on the witness list is a clear violation of Crim.R. 16(C)(3). 'Subsequent decisions interpreting *Hannah* have held that Crim.R. 16(C)(3) is applicable *only* where the "uncalled witness" had been supplied to the opposing side during the discovery process. * * * Where the witness mentioned is *not* on the list or there was *no* discovery list, counsel may comment on any absent witnesses.' * * * *Jackson v. Howell* (1993), 86 Ohio App.3d 497, 500 [621 N.E.2d 573, 574–575]." (Emphasis added.) *Id.* at 38.

In the case *sub judice,* the uncalled witness's name was on the list, but that fact was not mentioned by the prosecutor. The fact that appellant's wife's name was supplied to the opposite side during discovery and did appear on the list is determinative, irrespective of the prosecutor's failure to mention the fact that her name appeared on the list.

The Second District Court of Appeals cogently stated in *State v. Chinn* (Dec. 27, 1991), Montgomery App. No. 11835, unreported, at 7, 1991 WL 289178:

"Crim.R. 16(C)(3) provides that 'the fact that a witness' name is on a list furnished under subsection (C)(1)(c), and that the witness is not called shall not be commented upon at the trial.' The Supreme Court has interpreted this to mean that once a person's name is placed upon a witness list there is an absolute bar upon mentioning his absence at trial. [*Hannah* at 90, 8 O.O.3d at 87–88, 374 N.E.2d at 1363–1364.]

"The State argues that this is not the law in Ohio because the rule did not appear in the syllabus of *Hannah.* However, the Supreme Court specifically found in *Hannah* that an almost identical statement by a prosecutor constituted error. Also, our sister courts have decided that the prohibition in *Hannah* is the law of this State. *State v. Ingle* (Apr. 20, 1989), Cuyahoga App. No. 54483, unreported, 1989 WL 43396; *State v. Smith* (May 12, 1988), Franklin App. No. 87AP–300, unreported, 1988 WL 48024; *State v. Carter* (Dec. 27, 1985), Columbiana App. No. 84C55, unreported, 1985 WL 4801; *State v. Harris* (May 11, 1984), Lucas App. No. L–83–223, unreported; *State v. Yoho* (June 17, 1981), Stark App. No. 5578, unreported, 1981 WL 6326; *State v. Harris* (Dec. 29, 1978), Summit App. No. 8979, unreported. Several of these courts, including our own, have questioned the wisdom of this interpretation of Crim.R. 16(C)(3). See, *State v. Walton* (May 11, 1987), Clark App. No. 2241, unreported, 1987 WL 10941; *State v. Brooks* (June 4, 1987), Montgomery App. No. 9190, unreported, 1987 WL 12231. See, also, the dissent per McCormac, J., in [*Hannah* ], *supra,* at 91 [8 O.O.3d at 88, 374 N.E.2d at 1364].

"We continue to hold to the view that the better interpretation is that the State is prohibited from mentioning the absence of a witness *in conjunction with* the fact that he was named on a witness list. However, this element, though apparently contained in the rule itself, is not required by *Hannah.* Courts have found no *Hannah* violation in previous cases because there was no evidence that the witness in question was actually named on a witness list. See, *e.g., Walton, Ingle,* and case[s] cited therewith *supra.*

"In this case Chinn's brother was named on a witness list. Therefore, the court should have ordered the comment of the prosecutor stricken. It was error to fail to do so. However, because we find that Chinn would yet have been found guilty even absent this comment, the error was harmless."

This writer agrees with the reasoning espoused by the dissenting justices in *Hannah* and the interpretation of its application as expressed in *Davie* and *Chinn*. However, since we are an error court, and not a policy court, I believe that we are compelled to follow the rule of law, strictly, as articulated by the majority in *Hannah* under these particular circumstances.

I note, parenthetically, that, contrary to the majority's statement, the *Jackson* court did not expressly adopt the reasoning of the dissent in *Hannah*. Rather, the *Jackson* court held that there was no error because the "uncalled witness" was not named on a witness list exchanged during the discovery process and, therefore, Crim.R. 16(C)(3) did not apply. *Id.*, 86 Ohio App.3d at 501, 621 N.E.2d at 575–576.

Pursuant to *Hannah*, the trial court erred by failing to strike the prosecutor's comment from the record. See *Chinn* at 7. However, based on the other evidence presented at trial, I believe that appellant would have been found guilty absent this comment and, therefore, the error was harmless. *Id.* Thus, on that basis, I agree with the majority that appellant's first assignment of error is without merit.

In summary, I concur with the majority's conclusion that the second assignment of error is with merit. I further agree with the majority that appellant's first, third, fourth, and fifth assignments of error are without merit, and I concur on that basis.

CHRISTLEY, Judge, dissenting.

I respectfully dissent to the conclusion reached by the majority in the second assignment of error on the necessity of a reversal regarding the issue of the grand jury irregularity. I also dissent as to part of the analysis of the first assignment of error.

*Vasquez v. Hillery* (1986), 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 is cited by the majority as requiring a reversal. I disagree. That case concerned a situation in which a factual determination was made that there had been a deliberate and total omission of blacks from the grand jury selection process. The holding by the United States Supreme Court was that when the grand jury selection has been tainted by such intentional discrimination, it is not possible to purify the taint by a subsequent conviction by the petit jury. However, that holding was very specifically directed at deliberate violations of the right to equal protection such as the purposeful exclusion of members of a racial group.

In *Vasquez*, the court stated:

"We reaffirmed our conviction that discrimination on the basis of race in the selection of grand jurors 'strikes at the fundamental values of our judicial system

and our society as a whole,' and that the criminal defendant's right to equal protection of the laws has been denied when he is indicated by a grand jury from which members of a racial group purposefully have been excluded.

" * * *

" * * * [A] conviction cannot be understood to cure the taint attributable to a charging body selected on the basis of race. Once having found discrimination in the selection of a grand jury, we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted. The overriding imperative to eliminate this systematic flaw in the charging process, as well as the difficulty of assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal." *Id.* at 262–264, 106 S.Ct. at 622–624, 88 L.Ed.2d at 609.

Although appellant, in the instant case, never got his hearing on the issue of the extent of the irregularity, there is simply nothing to suggest that this was more than a technical error, much less a racial issue or civil rights problem.

The next issue concerns the first assignment and the prosecution's comment on the nonappearance of appellant's wife as a witness. I disagree with the primary analysis of the majority, but agree with their conclusion of harmless error. As did Judge Ford in his concurring opinion, I find myself in philosophical agreement with the dissent in *State v. Hannah* (1978), 54 Ohio St.2d 84, 93–94, 8 O.O.3d 84, 89–90, 374 N.E.2d 1359, 1365–1366. It was appellant, in his own testimony, who first mentioned the existence of this potential witness who apparently could corroborate portions of appellant's testimony. The defense should not be able to foreclose comment by the prosecution as to the existence of an invisible witness created by the defense. I cannot believe that Crim.R. 16(C)(3) was intended to include such circumstances. Common sense requires the interpretation that the rule was intended to prevent the defense from being blindsided. That was not the case in the instant matter. Regardless, I agree that any error in this regard was harmless.

I, therefore, dissent as to the key issue involving the alleged grand jury irregularity, and I would affirm the judgment of the trial court in all other respects.