DECISION AND JOURNAL ENTRY
Following a jury trial in the Lorain County Court of Common Pleas, Mark Ryder was convicted of violating a temporary restraining order, in violation of R.C. 2919.27(A)(1), aggravated burglary, in violation of R.C. 2911.11(A)(1), intimidation, in violation of R.C. 2921.04(B), domestic violence, in violation of R.C. 2919.25(C), aggravated menacing, in violation of R.C.2903.21, and felonious assault, in violation of R.C.2903.11(A)(1). Ryder has appealed from these convictions.
Ryder has asserted that the trial court erred by (1) finding him guilty of aggravated burglary when it was against the manifest weight of the evidence; (2) finding him guilty of intimidation when it was against the manifest weight of the evidence; and (3) denying his request for a mistrial, which was premised on prosecutorial misconduct during closing arguments. We overrule all three assignments of error and affirm the judgment of the trial court.
 I
Ryder and Theresa Hyer were romantically involved from sometime in 1993 until August 1998. Theirs was a stormy, on-again, off-again relationship, at least from the time their son was born, in 1996, to the fall 1998 events that formed the basis of the charges against Ryder. Hyer testified that she wanted to let Ryder see his son but did not want to be personally involved with Ryder. Both the State and Ryder submitted evidence of some consensual contact during the relevant period of time. Despite the existence of an intimate relationship with Ryder, Hyer testified that she never let him in her house when her children were there. Her daughter also testified that Ryder was never invited over and into the house.
According to testimony on behalf of the State at Ryder's trial, on September 4, 1998, Ryder appeared at Hyer's door sometime before 4:30 in the morning. Patrolman Brett Bangas, the officer who arrived on the scene shortly after 4:30, testified that Ryder was "banging on the door and screaming, `Theresa, Theresa, let me in.' * * * He was kicking the door and banging on the door, and just yelling and screaming." The officer indicated that Hyer "didn't want him there * * * she wanted me to take him away." Hyer's ten-year-old son described the same incident. He testified that "We kept my mom kept on talking to him, and he wouldn't leave. We kept pushing the door shut, but he wouldn't go." The testimonial descriptions of the same incident by Hyer, her thirteen-year-old daughter, and her next door neighbor Cheryl Green were similar. Patrolman Bangas testified that he took Ryder to the booking car, for transport to jail.
Hyer testified that on October 5, 1998, she was sleeping on the couch in her combination bedroom/den. Sometime between midnight and dawn she was awakened by the sensation of "a hand over [her] mouth." She immediately recognized that the hand belonged to Ryder. He held one hand on her mouth "squishing my face" and with the other hand "pulling my hair, dragging me out the side door." She was prevented from screaming because of his hand over her mouth. She testified, during cross examination, that Ryder brandished a knife when he awakened her and that he threatened to slit her throat if she screamed. With respect to whether she walked, or was dragged out the door, Hyer testified that she didn't resist as much as she might have because "the more I resisted the worse the pain was," and that "once he threatened to slit my throat, that whatever he told me to do, I was going to do it." Nonetheless, she testified that her she did not willingly comply with his demand that she accompany him outside the house.
Hyer testified that once Ryder got her in her van, which was parked in the driveway, he sat on top of her, punched her repeatedly and "twisted my leg * * * so hard * * * that I never, ever in my whole life felt pain like that, ever." Once it began to get light outside, Ryder left. Hyer testified that, before he left, "He told me if I called the police he was going to kill me."
Hyer went back into her house. Her daughter came downstairs shortly thereafter and discovered a badly bruised Hyer sitting in the back room crying. Hyer called a friend, who came over. The friend summoned the police on Hyer's behalf. Officer Marrero arrived at Hyer's home close to 11:00 a.m. on October 5. He testified that Hyer repeatedly said she was "afraid that this guy is going to kill her." During his interview with Hyer, "She would put her hands through her hair, and as she did this, wads of hair were mangled through her fingers."
Carrie Covender, a long time family friend of Ryder's, testified on his behalf. According to Covender, she saw Hyer twice on Saturday, October 7, 1998.[1] The first time Hyer was walking unassisted to her car carrying two pumpkins, and later that evening Hyer was fast dancing. She testified that Hyer had no visible bruises or other injuries on that day, but that if Hyer was injured as severely as the evidentiary photograph indicated, Covender would have noticed it. When confronted with the fact that October 7, 1998, was a Wednesday, Covender was certain she saw Hyer on a Saturday. She was also certain that she saw Hyer in October because the pumpkin trailer didn't set up until the beginning of October like "when they sold Christmas trees there, it was the 1st of December." She testified that she was certain it was the Saturday after Ryder was arrested when she saw Hyer, because she recalled being surprised when Ryder's sister reported the next day that he had been arrested for beating Hyer.
Gregory Kimbrough also testified on behalf of Ryder. He was Ryder's employer, and Ryder lived in a trailer on Kimbrough's property. He testified that Hyer appeared at his house on October 5, 1998, at approximately 2:00 a.m. According to him, she left about a half an hour later. Because Ryder had made it clear to Kimbrough that he did not want to see Hyer, Kimbrough falsely told Hyer that Ryder was not there. Kimbrough testified that he called Ryder at approximately 4:00 a.m. and spoke with him, and that at about 7:00 a.m. he awakened Ryder for work. On cross-examination, Kimbrough's trial testimony was challenged by reference to his testimony at the preliminary hearing. At that proceeding he testified that he called Ryder at "about 4:30 a.m. * * *, but the phone just kept ringing." At that hearing he also testified that he went to the trailer and heard movement shortly after being unable to reach Ryder by phone, but did not actually make contact with Ryder until seven or seven-thirty in the morning. The jury was specifically cautioned that Kimbrough was not an alibi witness.
During closing arguments, the State suggested that Ryder would argue that because of his prior relationship with Hyer, his entrance to her home on October 5, 1998, was not a trespass, but rather a permitted visit. The State attempted to pre-empt that argument by suggesting that an acquaintanceship with someone, for example a mailman, does not give that acquaintance permission to turn up in one's bedroom in the middle of the night, even when that relationship includes an occasional invitation into the home. Ryder countered that the mailman analogy was not appropriate, because Ryder and Hyer "have a kid together. There's more to this relationship." He suggested that Hyer left the door open so that either Hyer's husband ("John")[2] or Mark could come in without awakening Hyer's children and could leave before the children awoke in the morning. The State responded by describing the events of October 5, as testified to by Hyer, and asking the jury to consider whether it meant that "everybody that I have ever had a relationship with * * * can come into my house and do that to me or vice versa," and suggesting that, "There's got to be some cutoff there." The State followed with a summary of the testimony by Hyer, her children, and her neighbor that would support a jury conclusion that Ryder was not invited in on the evening of October 5, regardless of any relationship between the two.
During his close, Ryder argued that Hyer's story didn't make sense, and queried the jury, "Is that what happened, or did John do this in the house?" In response, the State suggested that, "If they think John was somehow involved, they could subpoena John. They could subpoena his work records." Ryder objected, on the basis that the defense did not need to prove anything. The Court, in response, cautioned the jury that "the law is that the defendant need do nothing, okay. He is cloaked with the presumption of innocence." The State responded, "I absolutely agree. He doesn't have to do anything, but he can if he wants * * * if he thought that would help you as the jurors understand this case." Ryder made no further objection.
During his close, and in the testimony he chose to elicit, Ryder focused on Hyer's lack of active resistance, despite her job related training in defensive tactics. A typical comment was, "Then she opens the door [to the van], doesn't stomp on his foot or kick him in the groin or try to scream and get away, make a racket; nothing." In response to the argument that her lack of resistance might imply that she was not the victim of the crime charged, the State reminded the jury that Hyer "testified she tried to scream, but she had a hand over her mouth, and then she said she was threatened and she felt it would be easier." He followed that comment with the statement that "In fact, in a rape case, in rape cases, you don't have to — " The statement was interrupted by Ryder's objection that this case has nothing to do with rape. The State agreed, but suggested that "people don't fight back when [they] think and when they've been conditioned that it's easier just to get through this thing and then move on." The court did not rule on Ryder's objection.
The Court instructed the jury that, "The opening and closing arguments are designed to assist you, but they are not evidence." It also instructed the jury that, "[T]he defendant is presumed innocent until guilt is established by proof beyond a reasonable doubt. The defendant must be acquitted unless the State produces evidence which convinces you, beyond a reasonable doubt, of the truth of every essential element of the crime which is charged in the indictment."
 II
Ryder has argued that his convictions for aggravated burglary and intimidation were against the manifest weight of the evidence, and the judgment should be reversed. The Ohio Supreme Court has noted that "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]." State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. In determining whether this is one of those exceptional cases, we review the entire record, consider the credibility of the witnesses, weigh all the evidence, and make all reasonable inferences. Thompkins, 78 Ohio St.3d at 387. To sustain Ryder's assignment of error this court must find that, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. Id.
The judgment is not a manifest miscarriage of justice if "there is a real conflict in the evidence in the sense that reasonable men might honestly vary in their conclusions as to whether, on the whole record, the judgment rendered below is or is not supported by the evidence[.]" Schwartz v. Wells (1982), 5 Ohio App.3d 1, 5.
 A. Aggravated Burglary
Ryder was convicted of aggravated burglary. As relevant to the circumstances of this case, an individual commits aggravated burglary when he (1) by force, stealth, or deception (2) trespasses (3) in an occupied structure when another person other than an accomplice is present (4) with the purpose to commit a criminal offense in the structure and (5) inflicts or attempts or threatens to inflict physical harm on another. R.C.2911.11(A)(1).
As to the charge of aggravated burglary, the Court instructed the jury that:
 Before you can find the defendant guilty of [aggravated burglary] you must find * * * that the State of Ohio has proved all of the essential elements of [aggravated burglary], which are: On or about October 5th, 1998, the defendant, Mark A. Ryder, did knowingly, by force, stealth, or deception, trespass in an occupied structure, to wit: * * * A dwelling residence located at 2429 East 34th Street, Lorain, Ohio, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any felony offense, where the occupied structure was the permanent or temporary habitation of Theresa Hyer, in which, at the time, Theresa Hyer was present, or likely to be present, having inflicted or threatened to inflict physical harm on Theresa Hyer, and venue, that it happened in Lorain County, Ohio.
Because the jury was instructed, without objection, that it must find Ryder had the purpose to commit a felony offense, the instruction actually given to the jury will guide our manifest weight analysis.[3]
The court further instructed the jury that "`Stealth' means any secret, sly or clandestine act, to gain entrance." Trespass was defined for the jury as "any entrance or remaining in, knowingly made or done, in a structure, residence, dwelling, or building of another, which is unlawful if it is without authority, consent or privilege to do so." The court defined purpose as synonymous with intent and instructed the jury that, "The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means used, and all the other facts and circumstances in evidence."
Ryder has argued that because the jury found him not guilty of committing kidnapping, his conviction for aggravated robbery must be reversed as inconsistent. A conviction will generally be upheld, even if it is rationally inconsistent with the verdicts on other counts of a multiple count indictment. See State v. Adams
(1978), 53 Ohio St.2d 223, 228 and paragraph two of the syllabus, judgment vacated on other grounds (1978), 439 U.S. 811,58 L.Ed.2d 103. Here, however, Ryder's conviction is not necessarily inconsistent with his acquittal on the charge of kidnapping. The Supreme Court has observed that the offender need not actually commit the criminal offense, so long as the intent to commit the offense was formed. State v. Mitchell (1983), 6 Ohio St.3d 416,419. The intent to commit a criminal offense therein may be formed at any point during the continuing trespass in the structure. State v. Fontes (2000), 87 Ohio St.3d 527, syllabus.
As to the element of stealth, early in the morning of October 5, Hyer was awakened in her own room with Ryder's hand over her mouth. Ryder argued, on close, that because there were no signs of forced entry that the jury should infer that the door was unlocked. Once they made that inference, he asked the jury to infer from the unlocked door and from the relationship between the two that Hyer deliberately left the door unlocked so that Ryder could enter in the middle of the night. The jury, without losing its way, could easily have rejected Ryder's suggested inferences. If it believed Hyer's testimony, an unannounced entrance into Hyer's home, while she was sleeping, at a time when casual visits do not normally occur is easily described as a "secret, sly, or clandestine act, to gain entrance."
With respect to the element of trespass, Hyer testified that Ryder was never permitted in her home when her children were there. Hyer's children confirmed this. She testified that she did not invite him into her home on October 5, 1998. In contrast, Ryder's theory of the case as suggested during his closing argument, is that the lack of forced entry suggested an invitation to Ryder to enter in a way that would not alert the children to his presence in the house. He also suggested that the relationship between them implied that he had permission to enter on October 5. The jury could, again, have rejected Ryder's suggestion that the visit on October 5 was a prearranged and consensual one. Hyer's assertion, which is supported by her children's testimony, that Ryder did not have permission to be in her home, makes his presence there a trespass.
As to the element of the presence of a person, other than an accomplice, Hyer testified that both she and her children were in her home at the time of the events on October 5, 1998. Even the version of the events suggested by Ryder supports the conclusion that at least one person, other than Ryder, was present in Hyer's home that evening. Neither Hyer, nor her children, were Ryder's accomplices.
On appeal, Ryder has asserted that the jury determination that he had the purpose to commit a felony in Hyer's home was not supported by the weight of the evidence, because that same jury declined to convict him of kidnapping. As to that element, Hyer testified that Ryder brandished a knife and threatened to slice her throat if she screamed. Hyer attempted to scream, but could not because of Ryder's hand over her mouth. He grabbed her by the hair and, while squishing her face with his other hand, dragged her to the door. In order to avoid the pain that accompanies being dragged by one's hair, Hyer did not resist as much as she otherwise might have, as he moved her from her room to the van parked in her driveway. Although she did not put on a vigorous physical defense, neither did she consent to accompanying Ryder to her van.
The police officer who responded to the call on October 5 observed that when Hyer ran her fingers through her hair during his interview of her a few hours after she reported being dragged by the hair, "wads of hair were mangled through her fingers." From the accompanying description, it is clear that these wads of hair were no longer attached to Hyer's head.
Ryder requested that the jury consider the fact that neither Hyer's children, nor the next door neighbor heard any unusual noises that night. He also reminded them of Hyer's failure to struggle vigorously. He asked them to infer from this that Hyer willingly accompanied him from the house to the van.
The jury rejected the kidnapping charge, indicating that it found the State had not proven one or more elements of kidnapping. Ryder's brief suggests that element was force. Even assuming,arguendo, that Hyer ultimately willingly went with Ryder to her van, there is an abundance of evidence suggesting that at some point before that, during his continuing trespass in her house, Ryder intended to force Hyer to accompany him out of the house.[4] Hyer's testimony, corroborated circumstantially by Officer Marrero's description of the loose wads of hair on her head the next morning, was that Ryder tried to drag her by her hair from her room inside the house to her van outside the house. That testimony permits the inference that when Ryder yanked on her hair and demanded that she go outside, he intended to kidnap her. The jury's ultimate conclusion that the State had not proven that he actually kidnapped her does not conflict with a conclusion, beyond a reasonable doubt, that at some point during his trespass in her home he intended to do so.[5] Because the conduct from which it could infer Ryder's purpose took place in her home, during his continued trespass there, it did not lose its way when the jury found that Ryder possessed the requisite purpose to commit a felony offense therein.
With respect to inflicting, or attempting or threatening to inflict physical harm, Hyer testified that Ryder attempted to drag her from her room by her hair, and that it caused her pain. She also testified that while he was in her home he threatened to slice her throat if she screamed, and brandished a knife. Ryder, during his closing argument, focused on the apparent discrepancy between her testimony on direct examination in which she only related the knife incident in response to the question "[W]hat happened outside of the house?" and her testimony on cross examination that he brandished the knife in the house. Physical harm is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C.2901.01(A)(3). Although it is a relatively minor physical injury, yanking on Hyer's hair hard enough to cause pain and to pull it loose from her head is a physical injury. In addition, reasonable minds could differ as to whether the knife threat occurred in the house or outside. If the jury determined that it occurred in the house, that determination was reasonable.[6] Either incident would support a finding that Ryder inflicted or attempted to inflict physical injury while burglarizing her home.
Finally, Ryder suggested, through the witnesses on his behalf, the questions he asked the State's witnesses, and his closing argument, that either he was not the perpetrator of the offenses, that the offenses may even have occurred at some other time, or were made up entirely. Covender testified that she saw an uninjured Hyer shortly after October 5, 1998, apparently implying that Hyer's injuries were either sustained at another time, or were not that serious. Ryder suggested during close that John might have attacked her.
In contrast, Hyer testified that she recognized Ryder as the individual who entered her home in the early hours of October 5, 1998. Numerous witnesses testified that the relationship between the two was frequently acrimonious. That testimony included a description of one incident in which Ryder punched Hyer.[7]
Two individuals testified as to the date and accuracy of the photographs depicting Hyer's injuries. Hyer's daughter described her condition on the morning of the incident. In addition, The police officer verified that he took the report from Hyer on October 5, 1998, and that the photographs accurately depicted injuries on that date.
Although it would not necessarily have been unreasonable for the jury to conclude that someone other than Ryder victimized Hyer, perhaps at some other time, the evidence supporting this theory is not so great or persuasive as to make it one of the exceptional cases in which the evidence weighs heavily against the judgment. The jury did not lose its way and create a manifest miscarriage of justice when it determined, beyond a reasonable doubt, Ryder had committed every element of aggravated burglary. Ryder's first assignment of error is overruled.
 Intimidation
Ryder has asserted that his conviction for intimidation was against the manifest weight of the evidence. As it relates to this case, the State was required to prove that Ryder knowingly attempted to influence Hyer in the filing of criminal charges by an unlawful threat of harm to Hyer. See R.C. 2921.04. Hyer testified that after Ryder beat her severely, "He told me if I called the police he was going to kill me."
Ryder has contended on appeal that this does not constitute intimidation because Hyer ultimately spoke with police and because she stated other reasons for her initial reluctance to report the crimes to the police. Ryder misunderstands the focus of the statute, which is on his actions not on Hyer's response to them. Whether Ryder succeeded in preventing Hyer from filing a police report is irrelevant. Whether Hyer was reluctant to speak with the police for other reasons is irrelevant. Based on the uncontradicted testimony, immediately after violently beating Hyer, Ryder made an unlawful threat to kill her if she called the police. It is an eminently reasonable inference that the threat was a deliberate attempt to intimidate her with respect to the filing of a police report. His conviction for intimidating Hyer is not a manifest miscarriage of justice. Ryder's second assignment of error is overruled.
 Prosecutorial Misconduct
Ryder has asserted that the trial court erred by refusing to grant a mistrial premised on comments the prosecutor made during closing argument. He has asserted that the comments constituted prosecutorial misconduct. The grant or denial of a mistrial is left to the sound discretion of the trial court. State v. Widner
(1981), 68 Ohio St.2d 188, 190, certiorari denied (1982),456 U.S. 934, 72 L.Ed.2d 452. When the mistrial is requested because of alleged misconduct by the prosecutor during closing arguments, the asserted error must be evaluated in light of the latitude a prosecutor is permitted during closing argument. See State v.Liberatore (1982), 69 Ohio St.2d 583, 589. In order to obtain a reversal of a conviction, Ryder must show that the remarks were improper and that those improper remarks prejudicially affected substantive rights of the defendant. State v Smith (1984),14 Ohio St.3d 13, 14. The prejudicial impact of any improper remarks "must be considered in light of the whole case." State v.Williams (1995), 73 Ohio St.3d 153, 169, certiorari denied (1996),516 U.S. 1161, 134 L.Ed.2d 193, citing State v. Maurer (1984),15 Ohio St.3d 239, certiorari denied (1985), 472 U.S. 1012,86 L.Ed.2d 728. A conviction will not be reversed, where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would still have found the appellant guilty. State v.Smith (1984), 14 Ohio St.3d 13, 15, citing United States v.Hastings (1983), 461 U.S. 499, 510-511, 76 L.Ed.2d 96, 107.
Here, Ryder has asserted that three remarks by the prosecutor were improper and prejudiced his right to a fair trial. First, he has asserted that the State's comment on his failure to call John as a witness was prohibited by Crim.R. 16(C)(3). Crim.R. 16(C)(3) provides that "The fact that a witness' name is on a list furnished [as part of discovery], and that the witness is not called shall not be commented upon at the trial." The Supreme Court of Ohio has apparently interpreted this rule to mean that the presence of a witness' name on a discovery list furnished to the prosecution acts as an absolute bar to any comment on the defendant's later failure to call him as a witness.[8] SeeState v. Hannah (1978), 54 Ohio St.2d 84, 90.
Because it is not crucial to our review we assume, without deciding, that Crim.R. 16(C)(3) acts as a complete bar to prosecutorial comment on the defendant's failure to call a witness once the defense has included the name of that witness, even indirectly, on its discovery list of witnesses. In that event, because Ryder adopted the State's witness list, which contained John as a potential witness, it was error for the prosecutor to comment on Ryder's failure to call him as a witness. That error, however, did not prejudice Ryder's right to a fair trial. During closing arguments, Ryder suggested to the jury that John was the real perpetrator. In commenting that Ryder had the ability to subpoena John or his work records but did not do so, the prosecution did no more than suggest that Ryder could have presented evidence in support of his case, but chose not to. Fair comment on the failure of a defendant to present evidence in support of his case is not prejudicial. See State v. Williams
(1986), 23 Ohio St.3d 16, 20, certiorari denied (1987),480 U.S. 923, 94 L.Ed.2d 699. In addition, after responding to Ryder's objection, the court gave the jury a curative instruction, which it presumptively followed. State v. Ferguson (1983), 5 Ohio St.3d 160,163.
Ryder has also asserted that the prosecutor's queries to the jury as to whether the prosecutor's high school girlfriend, because of that relationship, now had permission to enter his home in the middle of the night and beat him up were improper. Those queries came as part of a continuing dialog between Ryder and the prosecutor about the nature of a relationship between two individuals from which permission for a midnight home entry could be inferred. The prosecution initially suggested that just because an acquaintance, such as a mailman, is invited into a home occasionally it does not give that acquaintance permission to later enter the home at will. Ryder responded that the relationship in this case was more significant, and included bearing a child together. In response, the prosecutor suggested that even in the presence of a prior relationship, for example his relationship with his childhood sweetheart, there had "to be some cutoff" beyond which permission could not be inferred.
Ryder did not object to the statement at the time it was made, but raised it in support of his motion for mistrial. Although it might have been better to avoid interjecting his personal life into the argument, the isolated comment by the prosecutor asking the jury to consider the logical extreme of Ryder's argument on the issue was not prejudicial, whether or not it was erroneous.[9]
Finally, Ryder has asserted that the prosecutor improperly analogized the attacks on Hyer to rape. In countering Ryder's emphasis on Hyer's lack of physical resistance, the prosecutor commented, "In fact, in a rape case, in rape cases, you don't have to — " Ryder interrupted with an objection, on which the court did not explicitly rule. On appeal, Ryder's entire argument is that "the rape comment and that fact that a rape victim is not required to show resistance inferred [sic] that Theresa Hyer was required [sic] to resist or attempt to help herself regarding the alleged assault by the victim [sic]." Reading the interrupted comment by the prosecutor in context, see supra at , it is possible to infer that the uncompleted thought was that rape victims are not required to demonstrate they resisted their attackers. Presumably, Ryder is concerned that the jury extended that concept to the charges against Ryder. Even if they did, such an extension was harmless, because none of the crimes Ryder was convicted of committing required that the victim resist or attempt to help herself.
None of the comments considered alone were prejudicial enough to require that a mistrial be granted. All three comments were isolated and brief. Ryder did not object to one at the time it was made, did not pursue the court's failure to explicitly rule on a second objection, and in the third instance a curative instruction was given. In addition, each comment was made, at least in part, in response to an argument Ryder made during his close. To the extent that the prosecutor strayed from the precise parameters of a permitted argument, the court's reminder that Ryder was not required to prove anything minimized the impact. In addition, the court reminded the jury that nothing the attorneys said during opening or closing arguments was evidence, and that the sole instruction on the law was that given by the court. Whether the comments are viewed in isolation, or as a whole, it is clear beyond a reasonable doubt that the jury would still have found Ryder guilty, even in the absence of the three comments by the prosecutor. The trial court did not abuse its discretion when it denied Ryder's motion for a mistrial. Ryder's third assignment of error is overruled.
 III
Ryder's first assignment of error is overruled because it was not against the manifest weight of the evidence for the jury to determine that, even if the kidnapping was not completed, Ryder formed the purpose to kidnap Hyer during his continuous trespass in her home. Because there was credible evidence that Ryder threatened to kill Hyer if she reported his crimes to the police, it was not against the manifest weight to convict him of intimidation. His second assignment of error is overruled. Ryder's third assignment of error is overruled because the prosecutorial misconduct, if any, was not severe enough to deprive him of his right to a fair trial. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
FOR THE COURT, SLABY, J., CONCURS, CARR, J., CONCURS IN JUDGMENT ONLY.
[1] October 7, 1998, was a Wednesday.
[2] Hyer was separated from her husband during the relevant dates.
[3] Criminal offenses include both misdemeanors and felonies. See R.C. 2901.02(A).
[4] On appeal, Ryder incorrectly equates purpose with attempt. He has suggested that the State must demonstrate an "attempt to commit a crime." The State must only demonstrate that Ryder formed the purpose to commit a crime. As the jury was instructed, purpose is synonymous with intent. Purpose, or intent, is only one element of criminal attempt. See R.C. 2923.02.
[5] As noted earlier, even an inconsistent verdict will not generally mandate reversal of a criminal conviction.
[6] The Supreme Court, in State v. Powell (1991), 59 Ohio St.3d 62,63, held that the offense of burglary continues as long as the trespass continues. From this it appears that the physical harm element must occur before the trespass, and thus the burglary, terminates. State v. Clark (1995), 107 Ohio App.3d 141, 146-147. Because a reasonable jury could have concluded that the knife threat occurred within Hyer's home, we do not decide whether a threat outside the home would satisfy this element of aggravated burglary.
[7] Ryder did not object to testimony that on one occasion he was seen punching Hyer.
[8] That interpretation, which is not included in the syllabus of the opinion, was vigorously criticized by the dissent, and since then by several district courts. State v. Hannah, 54 Ohio St.2d 84,93-94, McCormac, J., dissenting. See, also, e.g.,State v. Gunther (1998), 125 Ohio App.3d 226, 239. It has been explicitly rejected in opinions issued by the Fourth and Eleventh Appellate Districts, which have held that the prosecution may comment on a witness not called, so long as the prosecution does not also comment on the witness' inclusion on the witness list provided by the defendant. State v. Montgomery (Mar. 27, 1996), Washington App. No. 94CA40, unreported; Gunther (1997),125 Ohio App.3d at 239.
[9] The prosecutor did not state, as implied by Ryder's argument on appeal, that "an old girlfriend entering his home at night would not be allowed in his home." His comment was posed to the jury as a question, not a statement of fact.