OPINION
This appeal is taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Virginia M. Simon, appeals from her convictions for child endangering and complicity in the commission of child endangering following a trial by jury.
In 1996, appellant was a single mother raising three teenage children in Wickliffe, Ohio. While attending church one evening, appellant ran into an old friend named Darlene Lightner ("Lightner"). Appellant and Lightner had known each other years before when they were teenagers in the late 1970s. Over the years, they had drifted apart and lost contact with one another.
Upon meeting again in 1996, however, appellant and Lightner struck up a conversation and renewed their friendship based primarily on their common religious interests. As it turned out, Lightner was also a single mother of a five-year-old girl who had just entered kindergarten. Appellant began to babysit Lightner's daughter on a part-time basis in the autumn of 1996.
By early 1997, appellant and Lightner had both joined a weekly home Bible study class consisting of approximately six women. Through this discussion group, Lightner came to be impressed with what she perceived to be appellant's great depth of scriptural knowledge. The other women in the group, however, began to express disagreement with some of the views espoused by appellant. As a result, the Bible study group experienced attrition to the point where only appellant and Lightner continued to meet. During this same time period, appellant was continuing to babysit Lightner's daughter several days per week.
When the school year ended in June 1997, appellant commenced babysitting the little girl on a full-time basis while Lightner was at work. At about this same time, appellant offered to home school the child so that she would not have to return to public school in the fall. Lightner was excited by the prospect of her daughter receiving a Christian-based education, so she agreed to the home schooling arrangement.
Initially, Lightner was happy because it appeared that her daughter enjoyed playing with appellant's teenage children. Soon, however, appellant began to report to Lightner that the little girl was becoming disobedient. Although initially reluctant, Lightner eventually acquiesced and allowed appellant to begin spanking the victim whenever the child misbehaved in appellant's eyes.
On August 6, 1997, the victim turned six years old. At appellant's urging, Lightner canceled a planned birthday party because of the little girl's alleged misbehavior. By mid-August 1997, Lightner agreed to let her daughter reside continually in appellant's house. Lightner thereafter visited the child on lunch breaks from work and in the evening.
During this period, appellant began to administer corporal punishment and other disciplinary measures to the victim on a daily basis. Appellant also frequently authorized one of her teenage daughters, Joy Simon, to spank the youngster. Besides numerous spankings, appellant made the victim stand in the corner for long periods of time, and there was at least one occasion in which appellant ordered the little girl to kneel with pennies placed under her kneecaps. Appellant disciplined the youngster for a variety of reasons. These reasons included lying, stealing toys and dolls that belonged to appellant's children, not following instructions, and general disobedience.
Appellant and Lightner spoke frequently once the victim came to reside continuously in appellant's home. Lightner sought parenting advice and spiritual guidance from appellant about the proper way to raise a young child since appellant had previously been through the same things with her own children. Appellant discussed the spankings and other forms of discipline and urged Lightner to begin spanking her daughter when the latter would come to visit the child at appellant's residence. In doing so, appellant invoked various passages from the Bible, including Proverbs 22:15 ("Folly is bound up in the heart of a child, but the rod of discipline will drive it far from him.") and Proverbs 23:13 ("Do not withhold discipline from a child; if you punish him with the rod, he will not die."). Lightner heeded appellant's counsel and began to administer repeated spankings to her daughter.
The spankings became ever more frequent. In succession, appellant graduated from spanking the victim with her bare hand to using a wooden spoon, a metal spoon, and wooden breadboard. In addition, appellant and Lightner jointly decided that the victim should begin wearing a diaper and be made to sleep in a bathtub because the little girl's toilet skills had regressed as the disciplinary measures increased.
Matters came to a head on September 24, 1997. On that day, the victim was allowed to visit with her grandmother and her aunt. The grandmother, Thelma May McDermid ("McDermid"), is Lightner's mother. During this visit, McDermid noticed that the child appeared traumatized and could not sit down due to pain in her backside. McDermid took the child into the bathroom, pulled her pants down, and was horrified to see wounds on the little girl's buttocks and upper legs. McDermid immediately contacted the Wickliffe Police Department who launched an investigation that same day. The police interviewed McDermid and her granddaughter after which time McDermid and social workers from the Lake County Department of Human Services took the victim to a hospital for a physical examination.
Upon obtaining an arrest warrant, the police took appellant into custody on September 25, 1997 and transported her to the station where she was subsequently interviewed. Appellant answered the officers' questions and gave a written statement after being fully advised of the Miranda warnings.
Based on the results of the police investigation, the Lake County Grand Jury returned a ten-count indictment against appellant on February 13, 1998. The counts included two charges of child endangering in violation of R.C. 2919.22(B)(3) and eight counts of complicity in the commission of child endangering in violation of R.C. 2923.03(A)(1) and (2). All of the charges constituted felonies of the second or third degree. The complicity counts asserted that appellant aided, abetted, solicited, or procured Lightner and appellant's daughter, Joy Simon, in the commission of child endangering.
Lightner was charged separately for her role in abusing her daughter. She struck a plea bargain with the state whereby she received a two-year prison term in exchange for testifying against appellant.
The case against appellant proceeded to trial on April 27, 1998. The state called a variety of witnesses, including Lightner, McDermid, a social worker, a physician, and the investigating police officers. In addition, the state introduced photographic evidence of the injuries inflicted on the victim's backside and the written statement that appellant gave to the police. During its case-in-chief, the defense called several witnesses, including appellant.
On April 29, 1998, the jury convicted appellant of all ten counts. At the sentencing hearing, the trial court ordered appellant to serve definite five-year concurrent prison terms on three of the counts. The remaining seven convictions were merged for purposes of sentencing.
From this judgment, appellant filed a timely notice of appeal with this court. She now asserts the following assignments of error:
 "[1.] The trial court committed reversible error to the prejudice of the defendant-appellant by failing to exclude evidence offered by the state which was both irrelevant and highly prejudicial.
 "[2.] The trial court committed reversible error to the prejudice of the defendant-appellant by allowing the prosecution's line of questioning concerning the victim's psychological harm, resulting in the denial of defendant-appellant's due process rights and right to a fair trial.
 "[3.] The trial court committed reversible error to the prejudice of the defendant-appellant when it sustained the prosecution's objection to defense counsel's line of questioning concerning the state's failure to call the victim to testify at trial.
 "[4.] The trial court committed reversible error to the prejudice of the defendant-appellant when it denied defense counsel's request for a jury instruction on the result of corporal punishment
 "[5.] The finding that the defendant-appellant committed two counts of child endangering and eight counts of complicity to child endangering is against the manifest weight of the evidence."
 I.
In her first assignment of error, appellant claims that the trial court committed reversible error by failing to exclude certain evidence relating to the television show BattlestarGalactica. This evidence consisted of an atlas exhibit and testimony elicited by the state from Lightner and appellant.
Appellant offers two issues for review under this assignment. First, appellant maintains that the Battlestar Galactica evidence was irrelevant to the determination of the action and, therefore, should have been excluded pursuant to Evid.R. 401. Second, appellant argues that even if such evidence were deemed to be relevant, the trial court still should have barred its admission on the ground that the testimony and exhibit were highly prejudicial to her defense.
Battlestar Galactica was a science fiction show that aired on network television from 1978 through 1980. Two of the actors who starred on the show were Richard Hatch ("Hatch") and Dirk Benedict ("Benedict"), who played the characters of "Apollo" and "Starbuck," respectively.
At trial, the topic of Battlestar Galactica first arose during the testimony of Lightner. On direct examination by the prosecutor, Lightner described how the weekly Bible study group dwindled to the point where only appellant and Lightner continued to meet. By August 1997, Lightner testified that the focus of the Bible study classes began to change for the bizarre. Instead of simply discussing the Scriptures, appellant began to demonstrate a zealous interest in Battlestar Galactica and its co-stars, Hatch and Benedict. Appellant told Lightner that they needed to intercede on behalf of the two actors by praying that they would turn to Christianity. Appellant often times expressed the idea that she might one day team up with Hatch and Benedict to form a traveling ministry.
During the course of Lightner's testimony, the state introduced an atlas containing detailed maps of northern Ohio, southern California, and central Montana. These geographic regions ostensibly represented the respective locations of appellant, Hatch, and Benedict. On the maps, appellant had scrawled numerous religious notations. At trial, Lightner testified that she and appellant prayed over this atlas on several occasions in August and September of 1997. Lightner described these sessions as follows:
 "[W]hen she brought the Atlas over she would look through it and I mean just really look through it, the different words, the names of streets, and places and we were supposed to pray over those individual things to pray against them so that no evil things would happen and that they would be freed of things and it just got pretty bizarre."
In addition to praying, the two women anointed the maps with a special oil. According to Lightner, the anointing oil was supposed to symbolize "a special touch from God[.]"
Defense counsel objected to Lightner's testimony regarding the Battlestar Galactica actors and the prayer sessions involving the atlas. The basis for the objection was that such evidence was irrelevant to the question of whether appellant had committed the offense of child endangering. Following a sidebar conference, the trial court overruled the objection and allowed the testimony and the admission of the atlas as an exhibit.
The topic of Battlestar Galactica also arose during the cross-examination of appellant. Defense counsel again objected to the line of questioning, but the trial court overruled the objection. Thereafter, appellant testified that she and Lightner prayed over the atlas during their Bible study sessions in the late summer of 1997. Appellant indicated that they were simply praying that Hatch and Benedict "would come to know the Lord[.]" When asked whether the co-stars of Battlestar Galactica had become an important part of her life, appellant testified as follows:
 "Not really, I mean I had come across some information from Richard Hatch because he was a motivational speaker, started pulling up some of his stuff off the Internet, it was very good, dealt with self-esteem, dealt with trying to be a success in life * * *.
 "Darlene had come over one day when we were going through his success stuff, she was interested in it, so that's how basically, you know, we got kind of involved with some of the stuff he was doing."
On appeal, appellant initially argues that the testimony and atlas exhibit relating to Battlestar Galactica were irrelevant and, therefore, should have been excluded at trial. Before analyzing the merits of this argument, we first note the appropriate standard of review governing this issue.
It is well-settled that the determination as to the admissibility of evidence falls within the province of the trial court. Consequently, it is axiomatic that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. See, also, State v. Bey (1999),85 Ohio St.3d 487, 490.
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In essence, Evid.R. 401 establishes the threshold requirement that evidence must meet in order to qualify for admissibility. State v. Comstock (Aug. 29, 1997), Ashtabula App. No. 96-A-0058, unreported, at 10, 1997 WL 531304.
The trial court determines the relevancy of evidence and has substantial discretion to admit or exclude relevant evidence. Indeed, the Supreme Court of Ohio has observed that "[t]he issue of whether testimony is relevant or irrelevant * * * is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury." Columbus v.Taylor (1988), 39 Ohio St.3d 162, 164. Moreover, as a general matter, "the question of whether evidence is relevant is ordinarily not one of law but rather one which the trial court can resolve based on common experience and logic." State v. Lyles
(1989), 42 Ohio St.3d 98, 99.
This court has previously held that "[r]elevancy of evidence is to be decided by the trial court, subject only to review for an abuse of discretion." Comstock, 1997 WL 531304, at 10. Thus, in the absence of an abuse of discretion, an appellate court should not reverse the trial court's ruling on the relevancy of evidence.Id.
In the case at bar, we conclude that the trial court did not abuse its discretion by admitting the Battlestar Galactica
testimony. Such evidence was inextricably linked to the events leading up to the commission of the charged offenses.
Lightner's testimony was certainly relevant because it helped to explain how she and appellant formed a closer bond through their Bible study meetings in the summer of 1997. Indeed, the closer relationship between the two women was the core reason for Lightner's eventual decision to allow her daughter to reside continuously with appellant by the middle of August 1997. In turn, the decision to leave the victim in appellant's full-time care laid the groundwork for the repeated "disciplining" of the little girl, which formed the very basis of the criminal charges at issue in the present appeal. The Battlestar Galactica evidence helped form the background tapestry of the case, thereby setting the scene for the events to come.
The state was free to raise the subject of BattlestarGalactica with appellant when she exercised her right to testify on her own behalf. A review of the transcript demonstrates that the state basically asked appellant whether she and Lightner used the maps contained in the atlas to pray for the co-stars ofBattlestar Galactica. After conceding that they did, appellant was then afforded the opportunity to explain how she became interested in using the weekly Bible sessions to pray for Hatch and Benedict.
It must be remembered that evidence is relevant if it merely alters the probability of the existence or nonexistence of a fact properly before the trial court. See Weissenberger's Ohio Evidence (1998), Section 401.3, at 67. The Battlestar Galactica
evidence was relevant because it helped to explain the evolving nature of the relationship between Lightner and appellant and how the former came to rely on the latter to be the primary caretaker of the victim. Certainly, such facts were properly before the trial court. Thus, the trial court did not abuse its discretion in finding that the Battlestar Galactica evidence met the threshold requirement of relevancy under Evid.R. 401 and was, consequently, admissible pursuant to Evid.R. 402.
Appellant further argues that even if the BattlestarGalactica testimony and exhibit were relevant, the trial court should have nonetheless excluded such evidence under Evid.R. 403(A). This rule provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). The exclusion of relevant evidence is mandatory when its probative value is substantially outweighed by the circumstances described in Evid.R. 403(A).
Appellant does not assert that the Battlestar Galactica
evidence should have been excluded based upon the danger either of confusion of the issues or of misleading the jury. Rather, appellant maintains that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Specifically, appellant suggests that the state elicited theBattlestar Galactica testimony and introduced the accompanying atlas for the sole purpose of prejudicing the jurors by creating a question in their minds concerning appellant's religious sensibilities.
We do not agree. After reviewing the transcript, it is apparent that the prosecution was simply developing the background of the case. The prayer sessions that appellant and Lightner had, including those sessions focusing on the Battlestar Galactica
co-stars, were an inexorable part of their developing relationship which culminated in the repetitive spanking of the victim.
Moreover, with regard to the risk of prejudice, it must be shown that the prejudicial effect was unfair because it might have provided the jury with an improper basis for rendering its decision. Comstock, 1997 WL 531304, at 10. There is nothing in the record which suggests that the admission of the BattlestarGalactica evidence provided the jury with an improper basis upon which it returned its guilty verdicts against appellant. Indeed, the prosecutor's questioning of appellant and Lightner with regard to the Battlestar Galactica topic represented only a small fraction of their testimony.
The evidence relating to Battlestar Galactica was relevant and its probative value was not outweighed by the danger of unfair prejudice, let alone substantially outweighed as required by Evid.R. 403(A). The first assignment is not well-taken.
 II.
In her second assignment of error, appellant proposes that the trial court erred by allowing the prosecutor to engage in a line of questioning that touched upon the possibility that the victim may have suffered psychological harm from the repeated disciplinary measures. Pursuant to this assignment, appellant presents three different issues for review. We will examine each in turn.
The first issue presented for review is whether the trial court committed reversible error by allowing the state to inquire into possible psychological harm suffered by the little girl. According to appellant, such questioning constituted a breach of a pretrial agreement between the prosecution and the defense, whereby both sides agreed not to present evidence of psychological harm at trial.
As indicated previously, appellant was indicted on two counts of child endangering under R.C. 2919.22(B)(3) and eight counts of complicity in the commission of such an offense. Pursuant to R.C.2919.22(B)(3), no person shall "[a]dminister corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child[.]" Given the statutory language, the risk of serious physical harm is obviously an integral element of the offense of child endangering as proscribed by R.C. 2919.22(B)(3).
As used in the Revised Code, "serious physical harm to persons" is defined as follows:
 "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 "(b) Any physical harm that carries a substantial risk of death;
 "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).
The defense was apparently concerned that the state would attempt to prove "serious physical harm" as that term is defined in R.C. 2901.01(A)(5)(a), to wit: mental or psychological harm requiring prolonged treatment. Consequently, the defense filed a pretrial motion requesting that the trial court order a psychological examination of the victim. In addition, the defense moved for the public payment of a psychologist to serve as an expert defense witness based on the fact that the state had listed a child psychologist as a potential witness during discovery.
The record does not indicate that the trial court ever ruled on these motions. Apparently, the motions were withdrawn based upon an agreement that was reached between the prosecution and the defense prior to trial. In exchange for the withdrawal of the defense motions, the state agreed not to pursue potential psychological harm to the victim as evidence of the "serious physical harm" required by R.C. 2919.22(B)(3).
During the presentation of its case-in-chief, the defense called Dr. Marilee Gallagher ("Dr. Gallagher") as a witness. Dr. Gallagher, a board certified pediatrician, provided expert testimony on direct examination regarding the nature and extent of the injuries depicted in the photographs of the victim's buttocks and upper legs.
On cross-examination, the prosecutor asked the doctor what after-care recommendations she might have if the medical history demonstrated that the youngster had been abused. Dr. Gallagher recommended that the child be placed in a nurturing environment and that she receive counseling. When the prosecutor inquired as to whether such counseling might be long term, Dr. Gallagher indicated that it could be depending on the individual characteristics of the child.
Counsel for appellant objected to this testimony on the ground that the defense was being "sandbagged" because the state had previously agreed not to delve into potential psychological harm. In response, the prosecutor stated that she had agreed not to pursue the psychological harm theory in the state's case-in-chief, but she argued that it was not inappropriate to follow up on Dr. Gallagher's reference to the fact that the victim might need long term counseling. The trial court agreed that the line of questioning fell within the proper scope of cross-examination and, therefore, overruled the objection.
On appeal, appellant claims that the state breached the pretrial agreement. According to appellant, the alleged breach resulted in a deprivation of her rights to due process of law and a fair trial because the defense altered its trial strategy when it withdrew its motion for the public payment of an expert psychological witness.
Upon review, we do not agree that appellant's rights to due process and a fair trial were abrogated in any way by the prosecutorial questioning of Dr. Gallagher. The state did not offer evidence of potential psychological harm inflicted on the little girl by calling a child psychologist during its case-in-chief. In fact, the reference to psychological counseling only arose when Dr. Gallagher, a defense witness, suggested that the after-care treatment of the child might include a long term counseling component. The follow-up line of questioning by the prosecutor and Dr. Gallagher's responses thereto were very brief and did not constitute a significant part of her testimony.
Moreover, the scope of cross-examination is governed by Evid.R. 611(B). It provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Unlike the analogous Federal Rule of Evidence, Evid.R. 611(B) in Ohio does not limit cross-examination to factual matters that were previously addressed on direct examination. Thus, in the case sub judice, it did not matter that defense counsel never inquired into Dr. Gallagher's after-care recommendations. The prosecutor was free to cross-examine Dr. Gallagher about the prospect of long term counseling after the doctor referenced the possibility.
It is well-settled that the scope of cross-examination falls within the province and discretion of the trial court. In the absence of a clear abuse of discretion, an appellate court will not reverse the judgment of the trial court in this regard. Statev. Slagle (1992), 65 Ohio St.3d 597, 605, citing State v. Acre
(1983), 6 Ohio St.3d 140, 145. The trial court herein found the prosecutor's questioning of Dr. Gallagher to be within the appropriate range of cross-examination, and there is nothing to indicate that this constituted an abuse of discretion. The first issue subsumed under this assignment is without merit.
In the second issue presented for review, appellant postulates that the trial court committed reversible error by allowing the prosecutor to question Dr. Gallagher on matters that were outside her field of expertise. Specifically, appellant contends that Dr. Gallagher was qualified under Evid.R. 702 to testify as an expert witness in the field of pediatric medicine, but that she was not similarly qualified to provide testimony relating to the realm of psychology. From appellant's perspective, the prosecutor's questioning of Dr. Gallagher led the latter into giving psychological testimony for which she was not qualified as an expert.
This argument is wholly without substance. It is true that one of the prerequisites for being qualified as an expert is for the witness to possess "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[.]" Evid.R. 702(B). By virtue of her credentials, Dr. Gallagher was certainly qualified to testify as an expert medical witness who could provide the jury with specialized insight into the nature and extent of the wounds depicted in the photographs on the victim's posterior.
With regard to the disputed testimony, a review of the transcript demonstrates that Dr. Gallagher simply made a cursory reference to the possibility that the victim might benefit from counseling. Such a statement did not rise to the level of requiring an expert opinion that could only be rendered by a trained psychologist. Indeed, this testimony was given in response to a question posed by the prosecutor as to what after-care recommendations the doctor might have if she encountered the victim in her practice as a pediatric physician. Dr. Gallagher did not speculate as to whether the victim was experiencing any sort of mental condition, nor did she propose a psychological course of treatment. Rather, the doctor merely stated that the child might need counseling if the wounds depicted in the photographs were the result of physical abuse. This did not amount to an expert psychological opinion.
Moreover, the question posed by the prosecutor regarding after-care recommendations and Dr. Gallagher's answer were certainly within the basic comprehension of a lay person. The jurors undoubtedly had sufficient knowledge and experience to understand that a young child who had been physically abused might benefit from long term counseling as the child grew up. Therefore, the doctor's comment to that effect was essentially a statement of the obvious, rather than expert psychological testimony. See, generally, Evid.R. 702(A) (requiring that expert testimony must either relate to matters beyond the knowledge or experience possessed by lay persons or dispel a misconception common among lay persons).
Finally, we note that defense counsel used redirect examination to point out to the jury that Dr. Gallagher was not an expert in the field of mental health:
 "Q. Now you of course are not a psychologist or a psychiatrist?
"A. No, I'm not.
"Q. You of course can certainly make a referral?
"A. Right, absolutely.
 "Q. But do you have any idea how long treatment would be necessary if necessary at all?
 "A. That you don't know and that is up to the judgment of the psychologist or psychiatrist who is taking care of this person.
"Q. And that's something you have no idea about that?
"A. No."
It is apparent that the trial court did not err by allowing Dr. Gallagher to testify outside her field of expertise. The second issue raised under this assignment is not well-founded.
In the third issue presented for review, appellant asserts that the trial court committed reversible error by denying a defense request for an interrogatory to be submitted to the jury in order to determine the jurors' reliance on psychological harm as evidence of appellant's guilt. According to appellant, the trial court's failure to submit the requested interrogatory to the jury prejudiced her defense and cast doubt on the resulting guilty verdicts.
Prior to closing arguments, a conference was held on the record to discuss issues pertaining to the jury instructions. During this meeting, defense counsel requested that the trial court submit an interrogatory modeled after the definition of "serious physical harm to persons" as contained in R.C.2901.01(A)(5).[1] Pursuant to this Revised Code section, there are five different ways to define "serious physical harm" to a person. Defense counsel requested that the jury be given a written interrogatory containing these five definitions. The jurors would then be required to indicate which definition(s) they relied upon in reaching their verdicts.
The purpose of the interrogatory was to determine if the jury relied even partially upon the definition set forth in R.C.2901.01(A)(5)(a), to wit: "[a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment[.]" This "psychologically" based definition is in contrast to the other four definitions which all require some form of physical harm involving a substantial risk of death, permanent incapacity, permanent disfigurement, or pain.
Again, the defense was apparently concerned by Dr. Gallagher's statement on cross-examination that the victim might need long term counseling. In order to ascertain whether the jury was affected by this testimony, defense counsel felt that the interrogatory was necessary.
As a general matter, interrogatories are used in civil cases pursuant to the auspices of Civ.R. 49. Even appellant concedes that the use of interrogatories in the criminal context is rare.
Appellant has failed to establish that she had the right to submit an interrogatory to the jury. Neither the Ohio Rules of Criminal Procedure nor the Ohio Rules of Evidence makes any provision for the submission of such interrogatories in a criminal trial. State v. Rohr (Dec. 30, 1998), Summit App. No. 18908, unreported, at 16-17, 1998 Ohio App. LEXIS 6440, citing State v. Johnson (Aug. 29, 1985), Cuyahoga App. No. 48369, unreported, 1985 Ohio App. LEXIS 8664. The trial court quite simply was not required to submit the proposed interrogatory.
In this case, the trial court instructed the jury on the various definitions of "serious physical harm to persons" as set forth in R.C. 2901.01(A)(5). Appellant's concern that the jury relied upon the R.C. 2901.01(A)(5)(a) definition is misplaced. There was no evidence introduced at trial to suggest the victim had been diagnosed with a mental illness or condition of such gravity that it would require hospitalization or prolonged psychiatric treatment. In a similar vein, there was no evidence that the physical harm inflicted on the little girl carried a substantial risk of death, thereby effectively negating the possibility that the jury relied upon the R.C.2901.01(A)(5)(b) definition. Thus, it stands to reason that the jury found the element of serious physical harm to the victim was proved under one of the three remaining definitions.
It can not be said that the trial court erred in declining to submit the interrogatory. The third issue is meritless.
All three issues presented for review under this assignment are groundless. The second assignment lacks merit.
 III.
In her third assignment of error, appellant contends that the trial court erred when it sustained a prosecutorial objection during defense counsel's closing argument. Specifically, counsel posed the following question to the jury during closing: "Wouldn't it have been more profitable for you folks to have heard * * * [the victim] up there for a period of time?" The prosecutor objected to this rhetorical query. The trial court sustained the objection and instructed the jury to disregard the comment. On appeal, appellant now challenges the trial court's ruling with respect to the objection.
This proposed error raises a topic that this court has dealt with before. The question presented is whether the prosecution or the defense may comment upon the fact that a particular witness did not testify if that witness' name was supplied to the opposing side during the discovery process. The answer to this question goes to the very heart of how Crim.R. 16(B)(4) and (C)(3) should be interpreted.
Crim.R. 16(B)(4) provides as follows:
"(B) Disclosure of evidence by the prosecuting attorney
"* * *
 "(4) Witness list; no comment. The fact that a witness' name is on a list furnished under subsections (B)(1)(b) and (f), and that such witness is not called shall not be commented upon at the trial."[2]
This rule applies to defense counsel's potential comments with respect to a witness whose name is furnished on a list supplied by the prosecuting attorney. Crim.R. 16(C)(3) is the analogous rule governing the prosecuting attorney's potential remarks about a witness whose name appears on a list furnished by the defense under Crim.R. 16(C)(1)(c).
There are two different ways to construe the meaning and intent of Crim.R. 16(B)(4) and (C)(3). The first alternative is that there is an absolute bar to mentioning a person's absence at trial once his or her name is placed upon a potential witness list during discovery. The second possibility is that the rules form only a partial bar, to wit: the prosecution and the defense are prohibited from mentioning the absence of a particular witness in conjunction with the fact that he or she was named on the opposing side's witness list.
The Supreme Court of Ohio has ostensibly adopted the former interpretation, as opposed to the latter reading. In State v.Hannah (1978), 54 Ohio St.2d 84, 90, a bare majority of the Supreme Court held that a prosecutor's comment upon the absence of testimony from a potential alibi witness whose name was furnished by the defense on a discovery list was "a clear violation of Crim.R. 16(C)(3)[.]" This holding was delivered without any analysis of the alternative interpretation of the rule.
The majority opinion in Hannah was joined by only four justices. The other three justices dissented with regard to the majority's reading of Crim.R. 16(C)(3). In doing so, the dissenting bloc essentially adopted the view that Crim.R. 16(C)(3) was not intended to function as an absolute bar to any and all commentary upon the absence of a potential witness simply because that witness' name had previously been placed on a discovery list by the opposing party. Instead, the rules were only meant to preclude any comment which specifically called attention to the fact that the opposing party failed to call a particular person to testify after his or her name appeared on a witness list.
Despite the absence of a syllabus, the majority opinion inHannah represents the law in Ohio. Numerous courts have held likewise. See, e.g., State v. Ingle (Apr. 20, 1989), Cuyahoga App. No. 54483, unreported, 1989 WL 43396; State v. Smith (May 12, 1988), Franklin App. No. 87AP-300, unreported, 1988 WL 48024;State v. Carter (Dec. 27, 1985), Columbiana App. No. 84-C-55, unreported, 1985 WL 4801. The Supreme Court of Ohio has never overruled the Hannah majority's reading of Crim.R. 16(C)(3) and, by implication, Crim.R. 16(B)(4). Since Crim.R. 16 took effect on July 1, 1973, Hannah remains the most decisive interpretation of the rule as it relates to the propriety of comments directed to the absence of a person whose name appears on the opposing party's witness list.
At this point, we must address this court's prior opinion inState v. Gunther (1998), 125 Ohio App.3d 226. In Gunther, the prosecutor used closing argument to comment upon the defendant's failure to call his wife as an alibi witness, even though the defendant had listed his wife as a potential witness during discovery. On appeal, this court discussed the competing viewpoints of Crim.R. 16(C)(3) as expressed in the majority and dissenting opinions in Hannah. After doing so, the majority opinion found the dissent in Hannah to be the better interpretation of Crim.R. 16(C)(3) and then applied this as the relevant law in finding that the prosecutor's comment did not constitute error. See Gunther, 125 Ohio App.3d at 239. In essence, the majority opinion in Gunther invoked the Hannah
dissent as the governing law.
Upon closer review, however, it is apparent that two members of the three-judge panel actually disagreed with this analysis. In separate opinions, two judges in Gunther stated their philosophical agreement with the dissenting justices in Hannah, but nevertheless expressed the view that the prosecutor's comment was clearly improper based upon the fact that the majority opinion in Hannah is still the law in Ohio. While the prosecutor's comment in Gunther was a violation of Crim.R. 16(C)(3), the two judges concluded that the error was harmless in light of their belief that the defendant would have been found guilty absent the improper comment.
Thus, Gunther should not be construed as signaling that this court has abandoned the majority opinion in Hannah in favor of the dissenting opinion. In reality, a majority of the judicial panel in Gunther applied Hannah as it was written.
Although the majority opinion in Hannah is the law, the various opinions issued in Gunther make it obvious that the members of this court adhere to the belief that the dissenting justices in Hannah actually expressed the analytically correct interpretation of Crim.R. 16(B)(4) and (C)(3). Simply stated, these provisions were never intended to abrogate the right to comment generally upon the nonappearance of a witness under the appropriate circumstances. Rather, Crim.R. 16(B)(4) and (C)(3) were aimed only at preventing the pernicious scenario wherein the prosecuting attorney or the defense attorney might be tempted in the heat of a courtroom battle to comment upon the nonappearance of a witness by pointing out that the person's name had been submitted as a potential witness during the discovery process.
This is evidenced by the sub-caption given to Crim.R. 16(B)(4) and (C)(3), to wit: "Witness list; no comment." The intent of the rules is to bar the prosecuting attorney and the defense attorney from specifically referencing the fact that the opposing party failed to call someone whose name previously appeared on the opposing party's witness list. This affords the prosecuting attorney and the defense attorney the freedom to list all potential witnesses during discovery because they know that opposing counsel may not "score points" with the jury by drawing attention to a situation in which an individual who was designated as a potential witness was ultimately not called to testify at trial. The goal is to foster open discovery in criminal proceedings by prohibiting the prosecution and the defense from mentioning the absence of a witness in conjunction with the fact
that the person was named on a witness list.
Other courts have also questioned the wisdom of the majority view expressed in Hannah. See, e.g., State v. Chinn (Dec. 27, 1991), Montgomery App. No. 11835, unreported, at 7, 1991 WL 289178. We take this opportunity to urge the Supreme Court of Ohio to revisit the issue raised in Hannah regarding the proper interpretation of Crim.R. 16(B)(4) and (C)(3).
We turn now to the case sub judice. In her brief, appellant acknowledges that defense counsel was precluded by Crim.R. 16(B)(4) from commenting upon the fact that the state failed to call a witness who had previously been identified on a discovery list. Appellant, however, claims that her counsel's rhetorical question referencing the absence of the victim was proper because the little girl was never listed as a potential witness during discovery.
Appellant is simply wrong. The record shows that the prosecution filed a notice of discovery on February 27, 1998. As part of these discovery materials, the state included a list of potential witnesses for the prosecution. Contrary to appellant's assertion, the victim's name and address are clearly included on the list. Moreover, attached to the state's notice of discovery is an acknowledgement that the opposing party received a copy thereof. The acknowledgement was signed and dated by defense counsel.
In light of the fact that the victim was listed as a potential witness, defense counsel violated Crim.R. 16(B)(4) by commenting upon her absence from the proceedings. The trial court did not err by sustaining the prosecution's objection and ordering the jury to disregard the comment. The third assignment is not well-taken.
 IV.
In her fourth assignment of error, appellant suggests that the trial court erred by failing to instruct the jury in accordance with a proposed instruction that had been submitted by the defense. The record demonstrates that defense counsel filed a proposed jury instruction on the last morning of the trial. The instruction read as follows:
 "Although probative, the end result of corporal punishment cannot be conclusive of the standard of recklessness.
 "You must consider three distinct but interrelated categories: (1) the decision to administer corporal punishment; (2) the method of corporal punishment undertaken; and (3) the results of the punishment as applied, each of which must be considered in light of the required culpable mental state of recklessness on the part of the defendant."[3]
By virtue of Crim.R. 30(A), "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." State v. Comen (1990),50 Ohio St.3d 206, paragraph two of the syllabus. Appellant maintains that the trial court had a duty to give the requested instruction because it made the salient point that the end result of corporal punishment, standing alone, could not be conclusive of the mens rea
element of recklessness required to sustain a conviction for child endangering under R.C. 2919.22.
In its brief, the state observes that the trial court did give the proposed instruction, notwithstanding appellant's suggestion to the contrary. Upon review, it is obvious that the state is correct. The trial court did include the requested instruction almost verbatim in its charge to the jury. Appellant's inclusion of this assigned error apparently stemmed from oversight in reviewing the transcript. The fourth assignment is meritless.
 V.
In her fifth and final assignment of error, appellant posits that the jury's verdicts were against the manifest weight of the evidence. The test for whether a criminal conviction runs counter to the weight of the evidence is as follows:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also, State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring).
As a general matter, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. When reviewing questions of weight, the role of an appellate court is to engage in a limited weighing of the evidence adduced at trial in order to determine whether the state appropriately carried its burden of persuasion. State v. Davis (Dec. 31, 1998), Lake App. No. 97-L-246, unreported, at 12, 1998 WL 964598; Statev. Patterson (May 22, 1998), Trumbull App. No. 96-T-5439, unreported, at 14, 1998 WL 310737.
After reviewing the record, it is apparent that the verdicts were supported by the overwhelming weight of the evidence. There was a plethora of testimonial and other evidence upon which the jury could have relied in finding that appellant committed the offenses with which she was charged.
In this regard, there is no need to catalog the entire litany of evidence adduced at trial. Rather, we need only reference certain aspects of the evidence which were particularly incriminating.
Initially, we would note that the testimony of Lightner, the victim's own mother, was certainly damaging to appellant. In her testimony, Lightner described how appellant engaged in a systematic disciplining of the child. The discipline began with appellant swatting the youngster with her hand, but it soon escalated to the point where appellant progressed to using a wooden spoon, a metal spoon, and a wooden breadboard to administer repeated spankings to the little girl's buttocks. In addition to spanking the victim herself, appellant urged Lightner to engage in the same course of conduct when the latter came to visit her daughter at appellant's house.
According to Lightner, these spankings were inflicted on a daily basis. Indeed, the swattings were so frequent that eventually appellant and Lightner had to begin administering the blows on the child's upper legs because her butt was becoming so wounded and bruised. Lightner also testified that appellant suggested switching from the metal spoon to the wooden breadboard for much the same reason, to wit: the sting of the spoon was too concentrated at its point of impact, while the breadboard dispersed the impact of the blow more evenly across the victim's backside. Thus, appellant and Lightner knew what kind of damage was being inflicted on the little girl, but they nevertheless continued to spank her over and over again.
The state also elicited testimony from a variety of other witnesses during the course of the trial. These witnesses included McDermid, the emergency room physician who examined the little girl on September 24, 1997, and the police officers who conducted the investigation. All of these witnesses provided testimony that supported appellant's convictions for child endangering.
Beyond the testimonial evidence, the state introduced a series of photographs depicting the little girl's buttocks and upper legs as they appeared on September 25, 1997. These pictures showed several pustule-type wounds that were still seeping a clear fluid and other abrasions at different stages of healing. In addition, the photographs revealed bruising and other red markings.
Finally, we would note that the state introduced appellant's own words against her. After being fully Mirandized, appellant was interviewed at the Wickliffe police station on the evening of September 25, 1997. At the end of the interrogation, she provided a written statement to the investigating officers recounting her version of what had transpired. In this statement, appellant wrote the following:
 "I had made a decision that last weekend was it. If something didn't change, Dar[lene] would have to find another sitter. It had gotten to the point that * * * [the victim] had bruises and wounds on her butt that we had inflicted on her. 2 days we had (the kids and I) gone out for the day and Dar stayed at our house with * * * [the victim] the whole day. Each time when we got back * * * [the victim's] wounds were much worse. This in no way excuses what I did to * * * [the victim]. I take full responsibility for what I did. I could have stepped in at any time and ended this but I did not. I also continued to spank her and should not have. * * * I did spank * * * [the victim] far beyond what would even be termed okay. I am truly sorry for this and have no excuse. I know this does not change the pain that * * * [the victim] is going through and I am truly sorry. I wish I could go back and undue [sic] this but I cannot. * * * One of the officers here said Dar I were feeding off each other and he is right. We were. We were totally out of control in this whole situation." (Emphasis sic.)
Although brief, these words speak volumes and only served to validate the jury's verdicts. Whether appellant was motivated by a malevolent heart when repeatedly administering corporal punishment and other forms of discipline to the victim is irrelevant. In the end, what matters is that appellant allowed her overzealous desire to discipline a six-year-old child overcome any semblance of reasoned judgment.
In light of the evidence introduced at trial, we do not conclude that the jury lost its way or created a manifest miscarriage of justice such that appellant's convictions must be reversed and a new trial ordered. The fifth assignment is not well-taken.
 VI.
Based on the foregoing analysis, appellant's five assignments of error are without merit. Accordingly, the judgment of the trial court is affirmed.
 _________________________________ PRESIDING JUDGE JUDITH A. CHRISTLEY
NADER, J., O'NEILL, J., concur.
[1] In appellant's brief, it is suggested that the defense requested an interrogatory distinguishing between the R.C.2919.22(B)(3) and (4) versions of child endangering. This is not accurate. In actuality, defense counsel asked that the jurors be required to indicate which definition(s) of "serious physical harm to persons" they relied upon in reaching their verdicts. The error in appellant's brief is attributable to the fact that she is represented by a different public defender on appeal who apparently misunderstood the nature of the proposed interrogatory.
[2] The reference to "subsections (B)(1)(b) and (f)" in Crim.R. 16(B)(4) appears to be in error. In actuality, the prosecuting attorney has a duty to furnish the defense with a witness list under Crim.R. 16(B)(1)(e). It is a mystery as to why this rather glaring error has not yet been corrected.
[3] This instruction was modeled after the decision of the Belmont County Court in State v. Albert (1983), 8 Ohio Misc.2d 13.